# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| ADRIAN DIAZ,<br><br>    Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>    Defendant. | Case No. 3:25-cv-00003<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Adrian Diaz ("Plaintiff" or "Mr. Diaz") brings this action on an individual basis, against Experian Information Solutions, Inc. ("Defendant" or "Experian") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

1

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

2

<ol type="a" start="1">
<li>(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.</li>
<li>(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.</li>
<li>(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.</li>
<li>(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.</li>
</ol>

15 U.S.C. § 1681(a)(1-4).

8.     Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)].

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, Defendant has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

21.     Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA.  Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

6

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b) and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

35.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

36.     Adrian Diaz ("Plaintiff" or "Mr. Diaz") is a natural person residing in Charlotte, North Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

8

37.     Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, CA 92626, and is authorized to do business in the State of North Carolina, including within this District.

38.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

39.     The information Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

40.     Experian collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Experian collects and maintains information about them. Not only that, but consumers cannot remove information that Experian collects and maintains about them from the Experian database. Further, Experian sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Experian sold.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

42.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

43.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

44.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

45.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

46.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

47.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT'S PROCESSING OF CREDIT INFORMATION

48.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

49.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

50.     Defendant collects information from thousands of furnishers.

51.     The process by which Defendant receives, sorts, and stores information is largely electronic.

52.     Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

53.     Defendant takes credit information reported by furnishers and creates consumer credit files.

54.     Defendant maintains credit files on more than 200 million consumers.

55.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANT'S MIXED FILE PROBLEM

56.     Defendant knows that different consumers have similar names.

57.     Defendant knows that different consumers can have similar Social Security numbers.

58.     Defendant knows that different consumers with similar names can also have similar Social Security numbers.

59.     Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

11

60.     Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

61.     Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

62.     From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

63.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

64.     Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

65.     A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

66.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

67. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

68. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

69. Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

70. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff Applies for an Auto Loan

71. On or around August 4, 2023, Plaintiff decided to purchase a vehicle for work.

72. Plaintiff has an excellent credit history and, upon information and belief, expected to be approved for an auto loan with a 5-6% interest rate.

73. On or about August 4, 2023, Plaintiff went in person to Capital Ford of Charlotte, found a car he liked, and decided to apply for an auto loan through the dealership.

74. For Capital Ford to make a determination on Plaintiff's credit application, it needed to obtain copies of his credit files. Plaintiff provided Capital Ford with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

75. On or about August 4, 2023, Defendant sold a credit report about Plaintiff to Capital Ford in response to Plaintiff's credit application for an auto loan.

### Plaintiff's Application for an Auto Loan

13

76.     Defendant published an Experian credit report purportedly about Plaintiff to Capital Ford, which Capital Ford used in making its credit decision.

77.     However, the report contained information about another consumer.

78.     Based on the inaccurate report, Plaintiff was only approved for an auto loan with an 11-12% interest rate through non-party Ally Financial ("Ally").

79.     Plaintiff tried to speak to the dealership about the interest rate, inquiring why it was so high. However, the dealership said that his credit was not as good as he thought and that the rate was the best Plaintiff could get.

80.     Defendant's reporting was grossly inaccurate.

81.     Plaintiff was shocked and dismayed at the high interest rate because Plaintiff had been diligently working towards being a responsible credit user and he was relying on getting a car for work.

82.     Plaintiff needed a vehicle for work, so he ended up purchasing the car with the high interest rate through Ally even though he knew he deserved better.

83.     The credit file provided to Ally and Capital Ford by Defendant was patently false on its face because Defendant published the information belonging to another consumer.

84.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's Mixed Credit File as of August 2023**

85.     Shocked, worried, and confused, Plaintiff immediately reviewed his credit file from Defendant.

86.     On or about August 7, 2023, Plaintiff secured a copy of his credit file from Defendant.

14

87.     Upon reviewing the contents of the August 7, 2023 credit file, Plaintiff was horrified to see that his credit score had dramatically dropped approximately 180 points (from around 765 to 585).

88.     Plaintiff was also confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

89.     Specifically, Defendant was reporting the following eleven (11) accounts which did not belong to Plaintiff:

    (a)     Dept. of Defense
            Account Number: 589714X
            Date Opened: September 30, 2022
            Balance: $596
            Status: Collection account

    (b)     Navy Federal Credit Union (seven separate accounts)
            Account Number: 430015X
            Dates Opened: November 12, 2019; November 6, 2019; March 18, 2019;
            October 15, 2019; October 15, 2019; March 11, 2019; March 16, 2019

    (c)     Regional Acceptance Co
            Account Number: 279914X
            Date Opened: October 15, 2019
            Balance/ Past due: $3,098
            Status: Account charged off

    (d)     I.C. System, Inc
            Account Number: 145177X
            Date Opened: October 11, 2022
            Balance/Past due: $1,115
            Status: Collection account

    (e)     Capital One
            Account Number: 517805X
            Date Opened: January 20, 2021
            Balance/ Past due: $468
            Status: Account charged off

90.     Further, Defendant was reporting the following addresses which did not belong to Plaintiff. Plaintiff has only ever lived in North Carolina and Florida.

15

(a)     92 N 15th Street, Apt 2L, Bloomfield, NJ 07003

(b)     39004 72nd St, Fort Hood TX, 76544

(c)     1309 Winkler Ave Apt522, Killeen TX, 76542-6482

(d)     4976 Carrington Dr, Lancaster SC, 29720-6453

(e)     15610 Bellaire Ridge Dr, Charlotte NC, 28277-2909

91.     Further, Defendant was reporting the following employers which did not belong to Plaintiff. Plaintiff has never been in the military.

(a)     Dept. of Defense

(b)     Army

92.     By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

93.     Further, Defendant was also reporting the following account inquiries, with whom Plaintiff did not have an account relationship:

(a)     Discover Financial Services, June 26, 2022

(b)     Capital One, November 27, 2022

94.     Plaintiff did not apply for credit with any of the aforementioned entities and did not have a relationship with any of the aforementioned entities.

**Plaintiff's First Dispute to Defendant**

95.     On or about August 7, 2023, Plaintiff filed a dispute with Defendant online.

96.     Upon information and belief, Plaintiff disputed all unrecognized information with Defendant.

16

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

97.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

98.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

99.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

100.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

101.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

102.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

103.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

104.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

17

105.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

106.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

107.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### Defendant's Unreasonable Dispute Reinvestigation

108.    On or about August 16, 2023, Plaintiff received dispute results from Defendant.

109.    Defendant deleted the disputed Capital One account and several inquiries.

110.    Defendant also changed the social security number and changed the file name from the inaccurate "Damien Diaz" to the correct "Adrian Daniel Diaz."

111.    Defendant failed to conduct a reasonable investigation of Plaintiff's August 7, 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Plaintiff's Second Dispute to Defendant

112.    After receiving the previous dispute results, Plaintiff additional mixed information with Defendant on or about August 16, 2023.

18

## Defendant's Unreasonable Dispute Response

113.     On or about August 31, 2023, Plaintiff received Defendant's dispute response.

114.     Defendant removed the following accounts:

(a)     Regional Acceptance Co.

(b)     I.C. System, Inc.

(c)     Dept. of Defense

115.     However, Defendant continued to report information that **did not** belong to Plaintiff.

116.     Defendant failed to conduct a reasonable investigation of Plaintiff's August 31, 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

## Plaintiff's Third Dispute to Defendant

117.     On or about October 14, 2024, Plaintiff disputed again with Defendant via mail, disputing all inaccurate information.

## Defendant's Dispute Response

118.     On or about November 14, 2024, Plaintiff received a dispute response from Defendant.

119.     Defendant deleted all of the disputed information except for two of the other consumer's Navy Federal accounts.

120.     Thereafter, and upon information and belief, Defendant failed to fully unmix Plaintiff's credit file from that of the other consumer and Defendant likely continued to report the other consumer's information to Plaintiff's credit file and to third parties.

121.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

122.     Upon information and belief, Defendant continues to mix Plaintiff's credit file with that of the unrelated consumer and to sell information belonging to the other consumer as though it belongs to Plaintiff.

123.     Upon information and belief, Defendant continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

124.     As a result of the "mixed file," Defendant made it incredibly difficult for Plaintiff to obtain credit that reflects his actual creditworthiness.

125.     Plaintiff has spent numerous hours disputing the information with Defendant and has suffered sleepless nights, anxiety, stress, and fear. Plaintiff even cried out of despair that he could not resolve the problem.

126.     Plaintiff is still humiliated about the how the employees at Capital Ford of Charlotte laughed that Plaintiff wanted a good interest rate with "his awful credit history" and that they wouldn't believe many of the accounts did not belong to him.

127.     Plaintiff is still paying a very high interest rate on a car loan when he actually deserved a much lower rate with his good credit Experian score of 750 to 800 prior to the mixed file.

128. At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

129. At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

130. As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

131. Notably, neither Trans Union nor Equifax mixed Plaintiff's credit file with an unrelated consumer.

132. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

21

133.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; costs due to a higher interest rate;  loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Experian)

134.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

135.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

136.    On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

137.    Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

22

138. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

139. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; costs due to a higher interest rate; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

140. Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

141. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Experian)**

142. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

143. The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained

23

in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id.*

144.    The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

145.    Plaintiff initiated numerous disputes with Defendant and disputed inaccurate information reporting in his credit file and requested that Defendant correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

146.    Defendant failed to adequately respond to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

147.    Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

148.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; costs due to a higher interest rate; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and

emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

149.    Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

150.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

   i.    Determining that Defendant negligently and/or willfully violated the FCRA;

   ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

   iii.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

   iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Respectfully submitted this 3rd day of January 2025.

By: */s/ Dawn McCraw*
Dawn McCraw, NC Bar No. 54714
**CONSUMER JUSTICE LAW FIRM**
8095 N. 85th Way
Scottsdale, AZ 85258
T: 602.807.1527
F: (480) 613-7733
E: dmccraw@consumerjustice.com

25

*Counsel for Plaintiff*
*Adrian Diaz*